Act No. 171166 and No. 171354, the Conservation Law Foundation v. Scott Pruitt and the U.S. Environmental Protection Agency. Mr. Killian, good morning. I'd like to request two minutes for rebuttal. You may. Thank you. May it please the Court, I'm Chris Killian. I am representing the Conservation Law Foundation and in the Massachusetts docket the Charles River Watershed Association as well. Under EPA's own clear, unambiguous regulations, EPA must act under 40 CFR 124.52b to notify commercial, industrial, and institutional stormwater discharges of their obligation to obtain Clean Water Act, NPDES, National Pollutant Discharge Elimination System, permit. And to send an application form with a notice. Where did you get the language about industrial, institutional? I don't see that in the regulation. Correct. The regulation, neither of what we have characterized as the permit triggers, the unambiguous determinations that the regional administrator might make to find that operator shall obtain permits, or the regulation we're relying on as creating a mandatory act, in this case a ministerial act, that's very clearly and expressly defined, is source specific. So it includes residential sources of the language? Potentially. Well, not potentially, it does, doesn't it? Well, the language is not specific to source. So if we were to rule in your favor, even though you're not asking that notices be sent to residences, unless we were to read an exception into the statute along the lines that you read into it when you opened your remarks, a citizen suit could be filed tomorrow requiring EPA to send a notice to every single residence in any of the included watersheds here. The intent of the regulation and the purpose of the regulation, honestly, most likely its breadth, based on the preamble, is intended to rectify water pollution problems in the waters of the United States. It is not specific to source. So that was a yes? It's a yes. EPA's responsibility, both as imposed by Congress through section 402 P2E, which is specific and related to Congress's major concerns upon passage of the 87 amendments, that a top priority was addressing water quality standards. So take a residence, Joe Blow, who's got a property and he's got a cistern on his roof. He's very environmentally conscious, has a cistern on his roof and has an organic garden with permeable surfaces throughout his entire yard. He would get a notice saying he has to get a permit? Most likely he would not. Well, how would they know not to send him one? Well, I suppose, Your Honor, that they wouldn't. And maybe the rationale behind the breadth of these provisions is that notice is sent broadly. Well, doesn't that – I ask that question because it seems to bear back – when we talk about 124.52, we're talking about the administrator's decision that an individual permit is required under this section, shall notify the discharger in writing. And that seems to me that the administrator, before sending Joe a notice that he has to get a permit, which apparently he would not, that there would be some individualized determination of some type that there was a basis to demand that he have a permit. And under your approach, it would seem basically you'd send one of those notice letters to every property owner in the entire watershed. EPA – Whether they needed the permit or not, because you wouldn't have done the individual determinations. Well, there are – I guess there are three things that I would mention. One is that EPA conducted in Massachusetts in concert with the state and local watershed groups, in the case of the Upper Charles TMDL, in Rhode Island in consultation and cooperation with Rhode Island DEM, and then pursuant to EPA's statutorily mandated approvals of those TMDLs, very detailed analyses – Counselor, just as a follow-up to Judge Gallagher's question, those TMDL documents, they're very lengthy documents, a couple hundred pages. If we were to examine that closely, would we find that that document identifies any specific dischargers of the stormwater that's at issue? I think the answer is no. Isn't that correct? That's not what that document is about. It does not identify specific dischargers. It identifies categories within geographic areas. And EPA's regulation, 40 CFR 122.26A9 Romanet 1D, specifically indicates that wherever the regional administrator determines that a category of discharges within a geographic area is contributing to a water quality standards violation, exactly what was done in these TMDLs, those dischargers shall obtain permits. Similarly – Why are you relying on 124.52, which isn't the requirement that you shall obtain a permit? It's the requirement at issue here that the administrator send notice that someone is required to have a permit. And 124.52 refers to deciding that an individual permit is required, not a category. Correct. It doesn't refer to a category. There's a mismatch between your answer to Judge Lopez, which is I think that it doesn't identify any individuals, and you want to rely on a category, but the regulation that you're asking us to act under seems to be focused on individuals. Well, under the Clean Water Act, since passage of the Act, if a permit is required, there are one of two paths that EPA can pursue. And, of course, in certain instances, courts, circuit courts in particular, have identified new categories that EPA hadn't identified previously. The Act makes available essentially three options. One is under Section 301A, discharges to waters of the United States, point source discharges, shall be in compliance with a permit or are prohibited. And so courts have enforced that effluent standard in the Act as essentially prohibiting certain sources of discharge and have crafted injunctions to address that. Now, EPA usually responds with a permitting program. Where you have clear regulation, like we do in this case with regard to the permit, with regard to the determinations, either those permittees have to pursue individual permits, or if a general permit has been adopted covering a broad category, then they would be subject to that general permit. But there is no fourth way where a permit is required by self-effectuating regulations and that discharger is able to not proceed. Here, where there's no general permit, the only option and the readily available option in 40 CFR 122.21 is to apply for an individual permit. So our view is whenever, which is the first word in 124.52B, the regional administrator determines an individual permit is required. Okay, what is your definition of determination? Is there a definition in the statute? There is not. Okay, and what is your definition of it? Well, certainly our definition includes the statutorily mandated and very specifically enumerated in the statute and regs process of developing TMDLs and wasteful applications. Is that the only definition of determination that there is? No, sir. There are various definitions. I have three pages of definitions of determination. Agreed. And that means, doesn't it, that the interpretation of the EPA should be giving deference on the share run? It does not, I think. I thought when there was a question as to how the statute should be read, that we owe deference to the agency. Well, the agency has simply adopted a regulation that says where the regional administrator determines and then set forth specific factual tests, very specific factual tests in C&D. They are very clearly elucidated. So wherever the regional administrator makes those determinations, those factual determinations, it would fall within the scope of the statute. There is no need for a narrow or broad definition of the word determination here. There is no discretion to be exercised. They set forth the factual tests, the specific jurisdictional tests. Is the category of discharges contributing to a standards violation? They've clearly reached that conclusion in these TMDLs through the statutorily mandated and clearly defined process of TMDL and waste load allocation development. Are additional controls needed on the discharge? That's C. Clearly, yes, they said that specifically in these TMDLs and approvals. So we don't need to focus on the word determination because EPA, through exercising its discretion in adopting these regulations, implementing the chapter, very clearly enumerated what the triggers are. And we've solely asked and presented the question, do TMDLs adopted pursuant to Section 303D with the very specific process set forth by Congress, very aggressive timelines, and the extensive EPA procedural regs, meet that test? And the answer should be yes, they do. The starting point is the word determination. And it seems to me that the EPA, in making its interpretation, is taking into consideration, perhaps, some of the policy issues that have been discussed as a result of the questions you've gotten from the bench. Well, we don't view any of these as policy questions. We view these as questions. So you don't think that having the whole population having to get a determination of policy? We think Congress set forth a very specific statutory provision, Section 402P2E. EPA essentially imported and slightly narrowed that statutory definition, statutory language, into its regulations with CMD and exercised its discretion, upheld on appeal, multiple circuits consolidated in the Ninth Circuit, and set up a process whereby dischargers pulled into that determination process shall be notified, safeguarded those dischargers by very specifically stating in the last section in 124.52, the issue of whether the determination was appropriate remains open in any subsequent proceeding. So they are not ultimately bound. Could you give a little context here? These laws have been on the books for what, over 25 years or roughly 25 years? And how often are TMDLs done? I mean, in the United States, are we talking about a dozen TMDLs or hundreds? I think you're talking about thousands of TMDLs. So thousands of TMDLs over the last 25 years. And I take it it's been a consistent practice of the EPA throughout those 25 years that it has not been sending these notices as a result of the TMDLs automatically. So, to my knowledge, the U.S. Environmental Protection Agency has never proactively effectuated these remedial provisions of the Clean Water Act in any circumstance without a petition from my organization. Just to put it in perspective how big a deal this is then, if we were to rule your way, then there would probably be millions of notices, literally. I see I'm out of time, Your Honor. Yes, of course. Okay, thank you. We are aware that in the Charles River, where we have severe cyanobacteria outbreaks threatening public health, safety, and welfare in the river, Mashpog Pond, an environmental justice community in the heart of Providence, and at First Beach in Newport, one of the greatest beaches in New England, those beaches are regularly closed. These waters are severely polluted by these very clearly determined categories of discharge. That determination was made through these very sophisticated, multi-year, multi-million dollar analyses. From our perspective, the determinations have been made there, and I can't speak to other TMDLs. I think your logic is that every one of these TMDLs in which they come up with waste load allocations that are at all comparable to this, the same logic would apply. So it seems to me we could be talking about requiring the EPA to send out millions of notices to business institutions and homeowners across the United States based on TMDLs that in this case are what some of them are over 10 years old. So we don't even know today if the person has a parking lot or doesn't. Well, I believe that EPA is in possession of information. That's obviously not before the court. These TMDLs make the determinations. The purpose of this statute, the sole purpose of this statute, is to rectify these sorts of water pollution problems. And Congress set forth these requirements, and it should be paramount for the Environmental Protection Agency to be rectifying these problems through reasonable programs. And here, a self-imposed ministerial act that simply gets these discharges in the process. And resorting to the notion that citizens of the United States have to show up with extensive administrative petitions to ask the agency to do something that they've already done through expenditure of millions and millions of dollars in taxpayer money. Are you really saying that between the requirements, between the information that is set forth in the TMDLs and the identification of who the individual dischargers may be and whether some should be subject to the permit requirement and some should not be, there is no discretion that the agency has to exercise in establishing the linkage between the general requirements of the TMDL and individual notification decisions? There's no discretion at all to be exercised? Our argument is that 124.52B sets forth a clear ministerial mandatory act. Now, we think that it's well within the scope of the court's authority in crafting a remand or remedy to order EPA to go forth and identify who they would notice. And that they can do so very rapidly. They have the information in their possession through TMDL development. But where the agency has failed for 27 years to implement its most fundamental mandatory duty under the act, which is to administer this law to protect the waters of the United States, that does not comport with the regulations. Thank you. You have two minutes. Thank you, Your Honor. Mr. Gunter, good morning. Good morning. I'm David Gunter from the Department of Justice here on behalf of EPA. Everybody who's here this morning wants the same thing, which is to make sure that the standards that Massachusetts and Rhode Island have set for their waters are met. But the Clean Water Act establishes a clear process for that to happen. States develop TMDLs. EPA approves the TMDL based on the science, if it meets the established criteria under Section 1313. And then the states carry out implementation plans to make sure that water quality standards are achieved. So we have reasonable programs to clean up these waters. We are administering the law. What CLF's argument would require the court to do would be to accept that Congress has unambiguously commanded EPA to supersede all of those programs and require potentially thousands of property owners in these watersheds to apply for Clean Water Act permits. The district courts here, both of them, were correct to reject that theory. The stormwater discharges in question are exempt from permit requirements unless Section 1342 P2E applies. And that requires both a legal determination by EPA and factual findings to support that determination. And I've addressed both of these this morning. But the place to start here is with the meaning of the statutory term determines. Section 1365 sets a high bar for mandatory duty suits. There has to be a clear command from Congress that leaves EPA with no discretion. And CLF agrees that EPA has discretion to make or not make a determination under Section 1342. It just says that once EPA makes that determination, further mandatory duties follow from that. But that begs the question, what does determination mean? And CLF essentially assumes that EPA's approval of a TMDL based on an administrative record means that EPA has determined the facts in that record within the meaning of Section 1342 P2E. And that the sources that are the subject of that determination are already, right now, subject to permit requirements and criminal and civil liability under the Act because of that determination. As the Court goes from reading EPA's regulations, our interpretation is different. Section 1342 requires an express formal determination in which EPA intentionally exercises residual designation authority to require individual sources to obtain a permit. And under the standards of review that apply here, the Court must accept that that does not create a mandatory duty. Counsel, what would move EPA to begin to evaluate whether individuals within an area covered by a TMDL, whether individual dischargers should be required to obtain permits? What would move you beyond the general findings of a TMDL to those more individualized determinations that a discharge permit should be required? EPA's regulations establish a process for that. In Section 122.26F, there's a process for citizen petitions that would ask EPA to consider those questions in more detail. So, do I understand you to say that the reliance would be on perhaps organizations like CLF or perhaps individual abutters to a site where there's a lot of stormwater discharge observed? That would be the reliance that individuals would bring petitions to EPA seeking an order that such discharge permits be required? Well, EPA has discretion to do it on its own, but the petition process provides another route for that to happen. And if the Court looks at subsection F of the regulation I just cited, it says that EPA citizens can submit a petition. EPA shall decide those petitions within 90 days or 180 days. That's what a mandatory duty looks like, using the word shall, establishing a time-certain deadline. And, in fact, EPA did that with respect to the Long Creek designation in Maine, which was a response to a citizen petition by CLF. So EPA does exercise its residual designation authority in that way, but it does it by examining the criteria that apply under Section 1342, not the Section 1313 criteria that it applies when it approves a TMDL. You cited two pathways, one the citizen petition and, secondly, the EPA doing it on its own without petition. In either of those pathways, is any notice given to the property owner who is being considered to receive one of these letters that the issue is under consideration? Yes, so in Section 124.52 of EPA's regulations, it says that when the regional administrator decides that an individual permit may be required, the regional administrator will send notice, or a state may also do this in the case of Rhode Island. They may send notice to the property owner, who then has a chance for feedback. And, again, if you … No, but before they make the determination, as I understand it, you're treating the TMDL as not a determination, like a drive-by determination. It's not intentionally directed here. That's right. But you're saying there are determination routes, the citizen petition and the EPA on its own. Those are routes to sending the letter. That's right. Is there notice given to the property owner before the letter is sent? In other words, before they receive a letter saying, we've determined that you need a permit. Yes, let me try and clarify 124.52. The regional administrator decides that an individual permit may be required, sends the letter to the property owner saying, we are considering this. You can see that in the supplemental appendix in the Long Creek designation. EPA made a preliminary designation and then held that open for notice and comment before it finalized the designation. And so only at that point, at the end when it becomes final, after notice and comment and opportunity to respond, then the permit obligation arises under the residual designation authority. Contrast that with what CLF is trying to do here, saying that the determination is somewhere in the administrative record for unrelated action, and private parties can dig through that, try and find what quote-unquote determination EPA has made, and then ask the court to impose the permit obligation itself. And the permit obligation is already there. Once the determination is made under 1342P2E, then stormwater dischargers can no longer take advantage of the general exception that Congress provided for them in section 1342P1. So right now, if a determination has been made, right now all of those sources are subject to water applicability. In contrast to the procedure that I just described in response to Judge Kato's question, where the permit obligation only arises after notice and comment, after EPA makes a discretionary determination, Mr. Hillian described a category of sources. The Long Creek designation describes that too, because EPA decided that only sources with one acre or more of impervious surface should be included in the group that was required to get permits. That helps avoid imposing a permit requirement on de minimis dischargers. And in fact, EPA's regulations establish that discretion by pointing out factors that EPA will take into account in exercising its residual designation authority, like the size and amount of the discharge, its proximity to waters of the United States, and quote-unquote other relevant factors, a phrase that establishes that EPA has discretion under these sections. If I can go back to the statute for a minute, though, as I mentioned at the outset, CLF's theory here requires a particular interpretation of the term determines, in Section 1342P2E, and there are good reasons to conclude that Congress did not intend TMDL approvals under Section 1313 to constitute a determination like that. The term determination is not defined in the Act, but it is used all over the Act in contexts that generally require EPA to make a considered determination based on established criteria and have formal legal consequences. For example, EPA has to determine whether a state is capable of carrying out a delegated Clean Water Act program. The Act also contains many mandatory duties, including the sections that are at issue in this very case. Section 1313 and Section 1342P, the stormwater provisions, both contain mandatory duties marked by the word shall and marked by date certain deadlines. But the kind of duty that CLF is alleging exists here is not marked by any of those indications of a mandatory duty. The Act also says that water quality standards can be achieved using several tools. One of them is the Clean Water Act permit process, but that's not the only one. And so several courts of appeals have held that TMDLs don't create enforceable obligations, but rather are planning tools for the states and EPA to use in coming up with further enforcement actions or permit requirements. That's how these TMDLs are currently being administered in Massachusetts and Rhode Island, and the court shouldn't ascribe any more legal authority to the TMDLs than that. But the court doesn't necessarily need to agree that that is the proper interpretation of Section 1313 and 1342 in order to affirm the district courts here. If that is a plausible interpretation of the Act, that's all that's necessary, and that's because we're operating under Section 1365, the citizen supervision that waives sovereign immunity. And the Supreme Court has held that unless the waiver of sovereign immunity is unambiguous, the court can't ascribe to Congress an intent to waive sovereign immunity in particular cases. And if there's anything we can say about the statute here, it's that Congress didn't unambiguously command the theory that CLF is urging on the court. But let me address the question that Judge Troy raised a few moments ago, whether Chevron deference is required. Our view is that the court doesn't need to apply Chevron because the mere fact that the ambiguity exists precludes the application of the waiver of sovereign immunity under Section 1365. But if the court decides that it needs to go beyond the existence of an ambiguity and resolve that ambiguity, then we would urge the court, as it did in Dominion Energy, to apply Chevron deference and accept the interpretation that EPA has laid out in its long-established regulations, which it promulgated with formal notice and comment in 1993 and 1999. EPA looked at Section 1342P and said, Congress ordered us to regulate some categories of stormwater discharge in subsections A through D, and we've promulgated those regulations, Phase 1 and Phase 2. But Section 1342P2E is more of a catch-all that allows us to give attention to sources that require some sort of special regulatory approach on a case-by-case basis. And that interpretation is reasonable in part because the consequences of not treating the statute that way are severe. Dischargers may not even be aware that EPA has supposedly made a determination in the Administrative Record for Unrelated Action and that they have a permit obligation. And they may not just get a letter from EPA saying you have a permit obligation. The Clean Water Act authorizes citizen suits against the discharger directly if that discharger has a permit obligation and has not obtained a permit. And so CLS theory would potentially permit that kind of action against private landowners who are the subject of what they call the determinations in the TNDLs. And all of that would interfere with the federal-state balance that the Act establishes. The reason that the Supreme Court requires an unambiguous waiver of sovereignty in these cases, as it said in SUA, is to avoid having the courts get involved in these kinds of complex administrative implementation of programs. And in SUA it was land-use plans. Here it's TNDLs. These are broad programmatic documents that inform further implementation by EPA and the states. And as I said before, the court shouldn't ascribe them any greater significance than that. Finally, I'll just say a couple of words about what these TNDL administrative records actually contain. EPA evaluated the TNDLs that the states submitted under the criteria established under Section 1313, not the criteria for permitting stormwater discharges under Section 1342. The TNDL documents are about science, not about implementation. So, for example, a number of them assign waste load allocations to groups of sources that include both regulated sources, like the City of Providence or Rhode Island Department of Transportation, and unregulated sources that may also discharge into those waters. And it's within the state's discretion to decide that they would try and obtain the reduction in pollutants that those waste load allocations call for by addressing primarily the permitted sources that they already have a relationship with and that they have control over, and that are the biggest sources in the area. EPA's TNDL approval documents said we're not approving the implementation plans. That's not our statutory role. It's not EPA's role under Section 1313, and the TNDL approval is explicitly said, and our approval does not extend that far. Even if EPA had approved those particular aspects of the TNDL, they are not specific enough to support individual permit requirements. EPA said that the state's aggregation of both regulated and unregulated sources in waste load allocations was okay in the absence of sufficient information to determine the relative contribution of regulated and unregulated sources. So the TNDLs themselves would require further analysis, as occurred in the Long Creek designation, before EPA would consider it appropriate to impose Clean Water Act permit obligations on sources that are not currently regulated. To close, I will simply state that mandatory duties under the Clean Water Act exist only if they are obvious on the face of the statute. CLS theory requires so many inferences from documents that are unrelated to the Section 1342P process that there's nothing obvious about the duty they're urging the court to enforce here, and as a result, the district court judgment should be affirmed. Thank you. Mr. Killian? Mr. Killian, I'd like you to work into your rebuttal, if you would, and answer this question. Your opponent described the Long Creek situation, and in its resolution, EPA made a determination that some stormwater discharges are de minimis and there should be no permitting requirement. How would your position allow for those kinds of determinations that some stormwater discharges simply should not count and should not be subject to any permitting requirement? Well, we certainly see that EPA, both in advising the State of Vermont and in the Long Creek determination, referred to de minimis sources as not triggering the permitting thresholds, and that makes complete sense. The discharges that were identified in the TMDLs, which I would characterize as very detailed, very granular, and very specific, both with regard to the source categories within multiple geographic areas, towns, sub-watersheds, the watersheds writ large, and with regard to ascribing specific percentage reductions within all of those different geographic areas. They looked at it from multiple different perspectives. There's certainly a determination by category that these sources need additional controls. So these are not de minimis sources. The sources that were clearly identified in these... But there might be some de minimis sources within one of those general categories. And EPA has provided for that. 124.52b specifically states that the question whether the determination was appropriate. This is after notice. This is after an application form is sent. That question remains open in any future proceeding. And I also want to refer the court to 40 CFR 122.26a. If you could go back, the letter that you want sent is a letter saying that an individual from the EPA to the landowner saying, quote, an individual permit is required. Correct. And yet I think Judge Lopez's question gets how would they decide before they make that determination that a particular use is or is not de minimis? Well, our argument is that with regard to these categories and the inclusion of these categories specifically in the waste load allocation with specific reduction numbers, there is no question that categorically they're non-de minimis. Now, there is the notice process. And then I wanted to refer the court to 40 CFR 122.26a.9, Romanette 3. The specter has been presented that somehow upon this initial ministerial, very clearly and specifically elucidated ministerial mandatory action, sending the notice and sending the application form. A9 Romanette 3 says that discharges shall apply for a permit within 180 days unless a longer time period is granted by the regional administrator, by the administrator. I believe it says administrator. There are safeguards and process safeguards subsequent to the notice and application form. And the TMDL has included extensive public process where numerous parties, the municipalities, the individual developers, developers by trade association, environmental groups, far more public process than has ever been included in Long Creek or any other determination. So, again, we believe that these are red herrings. And the real question is why, in fairness to municipalities that are already bearing these burdens and to effectuate this remedial statute, EPA is finding every possible way to talk about this perfect exemption that's been crafted by regulation instead of cleaning these waters up. Thank you, your honors. Thank you.